## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ANTHONY K. DAVIS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-cv-1431 (RC) |
| | : | | |
| v. | : | Re Document No.: | 14,15,16 |
| | : | | |
| THE GEORGE WASHINGTON | : | | |
| UNIVERSITY | : | | |
| | : | | |
| and | : | | |
| | : | | |
| ARAMARK FACILITY SERVICES, LLC, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### Granting Defendants' Motions for Summary Judgment as to All Counts Except for the Hostile Work Environment Claim Under the ADA.

## I.  INTRODUCTION

Plaintiff, Anthony Davis, was employed as a service worker/housekeeper by Defendant, George Washington University from March 8, 2008 to December 13, 2010. Plaintiff was diagnosed with depression, bipolar disorder, and substance abuse. He was terminated by the University on December 13, 2010. Plaintiff now files suit against George Washington University on three counts: (1) failure to provide medical leave, and retaliation, in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, (2) failure to provide medical leave in violation of the D.C. Family Medical Leave Act ("DCFMLA"), D.C. Code § 32-503 (2001), and (3) discriminatory discharge, disparate treatment, hostile work environment on the basis of Plaintiff's disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* Plaintiff also files suit against Aramark Facilities Services, LLC ("Aramark") for Tortious

Interference with Employment/Contractual Relations. The Defendants have moved for summary judgment on all counts. As explained more fully below, the Court concludes that the Defendants' motions for summary judgment should be granted.

## II. FACTUAL BACKGROUND

### A. GW and its Relationship with Aramark

George Washington University (hereinafter "GW" or "the University") is a private academic institution established in 1821, with its main campus in the District of Columbia. The University has an agreement with Aramark where Aramark provides housekeeping and facilities maintenance services to the University. Decl. Suzanne Williams-Valentine¶ 6, Def.'s Mot. Summ. J. Ex. 3, July 15, 2013, ECF No. 15. Aramark handles the day-to-day supervision of GW's housekeeping service workers. *Id*. GW manages the service workers' payroll and the administration of their employment benefits. *Id*.

### B. Mr. Davis's Position with GW

From March 8, 2008 until his termination on December 13, 2010, Mr. Davis was employed by GW as a service worker/housekeeper on the night shift in the Housekeeping Services Department. Decl. Williams-Valentine ¶ 5. He was a member of the Services Employees International Union, Local 32BJ ("Union"). Decl. Williams-Valentine ¶ 5.

Housekeeping Services is part of the Facilities Management Unit within the University's Facilities Services division. *Id*. In 2010, Mr. Davis reported directly to John Eshun ("Mr. Eshun"), then-Director of Facilities Management, who worked for Aramark. *Id*. at ¶ 7. Mr. Eshun, in turn, reported to on-site supervisor James Schrote, the Executive Director of Facilities Services and a GW employee. *Id*.

### C.  The Attendance Rules Applicable to Mr. Davis's Position

In his role as a housekeeper, Mr. Davis performed a number of traditional custodial duties, including mopping rooms, stripping and refinishing floors, washing windows and doors, operating buffers and vacuum cleaners, cleaning bathrooms, and polishing furniture.  Service Worker Job Description, Def.'s Mot. Summ. J. Ex. 4. The University maintains that Mr. Davis worked as a part of a team of housekeepers, and so when an employee is unable to report to work, other employees' schedules have to be adjusted. Decl. Williams-Valentine at ¶ 8. This can cause essential work to be delayed or not performed, or may require overtime to be paid. *Id.*

Mr. Davis is governed by the rules set forth in the Department's Work Rules ("Work Rules"), the Employee Handbook, and the Collective Bargaining Agreement ("CBA"). *Id.* at ¶ 9. The University maintains that Mr. Davis received these documents during his employment, and that he knew their requirements. *Id.* Mr. Davis asserts that he believed that the rules in GW's Employee Handbook and the Work Rules did not apply to him because he was a union employee —instead he believed that only the rules in the CBA applied to him, and nothing else. Pl.'s Decl. ¶ 33, Pl.'s Opp'n Attach. 2, Aug. 15, 2013, ECF No. 18 .   Under the Work Rules, "[a]n employee is expected to be at work on time and on a regular basis." Work Rules, Policy 1, Def.'s Mot. Summ. J. Ex. 5.  "Excessive tardiness or absenteeism will not be tolerated," and a violation can subject the employee to disciplinary action. With respect to absences for sickness, the Work Rules state that employees are expected to "call in 2 hours prior to the beginning of their regular working hours" and receive permission to be absent from their supervisor. *Id.* Policy 31.b.

The Employee Handbook provides that when an emergency illness prevents an employee from reporting to work, he must notify his supervisor "as soon as possible," and for "frequent unplanned absences due to illness," the supervisor may require medical documentation.

Employee Handbook §10.1.2, Def's Mot. Summ. J. Ex. 1. An employee who fails to provide

such documentation may be considered Absent Without Approved Leave ("AWOL"), and three

AWOLs "can result in disciplinary action up to and including termination." *Id.*

The CBA states that, to avoid AWOL status, an employee must "promptly provide[ ]

documentation or other medical evidence that establishes to the Employer's satisfaction that the

employee was unable to report to work due to illness." CBA §9.7, Def.'s Mot. Summ. J. Ex. 2.

An employee who has "[t]hree absences without approved leave (AWOL)" is deemed to have

engaged in conduct of a serious nature. *Id.* §20.2(12). Conduct of a "serious nature" may result in

discharge without advance warning. *Id.* §20.1.

### D.  Mr. Davis's August 24, 2009 Termination

Mr. Davis was terminated from his position by GW on August 24, 2009. Decl. Williams-

Valentine¶ 11. The University maintains that Mr. Davis was terminated for multiple absences

from work without timely requesting leave, or without providing medical documentation to

explain his absences. 2008 Notices of Absences, Def.'s Mot. Summ. J. Ex.6; Termination Letter

(Aug. 24, 2009), Def.'s Mot. Summ. J. Ex. 7. Mr. Davis maintains that he was improperly

marked as AWOL on numerous occasions prior to his August 24, 2009 termination. *See*

*generally* Pl.'s Opp'n.

Following his termination, Mr. Davis and the University entered into a Last Chance

Agreement ("LCA"), which reinstated Mr. Davis and treated the time between his August

discharge and February 3, 2010 as an unpaid suspension. Decl. Valentine-Williams ¶ 11; LCA ¶

1, Def.'s Mot. Summ. J. Ex. 8. The LCA required Mr. Davis "to meet normal performance

expectations and to comply with the employment standards applicable to other employees in his

position." *Id.* at ¶ 4. It also provided that "if Mr. Davis is absent from work without the

permission of his immediate supervisor on *any* occasion between February 3, 2010 and February 3, 2011, the University shall be entitled to discharge him immediately." *Id.* at ¶ 3 (emphasis added).

As a part of the LCA, the Union waived its right to grieve another discharge, other than to question "whether or not the immediate supervisor gave Mr. Davis permission to be absent." *Id.* As part of the agreement, Mr. Davis executed a Release, in which he waived all claims against GW and its agents related to the circumstances of the 2009 discharge pre-dating the Release's execution. Release, Def.'s Mot. Summ. J. Ex. 9.

### E.  Mr. Davis's Illness, and his Excused Sick Leave and FMLA Leave

Mr. Davis suffers from a variety of disorders, including depression, bipolar disorder, and substance abuse. Pl.'s Decl. ¶¶ 5-6, 14; Pl.'s Opp'n Exs. A-G. In November 2008, Mr. Davis disclosed to the University that he had a "Mental/Emotional" disability, which he identified as "depression." Voluntary Self- Identification Form, Nov. 1, 2008, Def.'s Mot. Summ. J. Ex. 22; Request for Accommodation form, Nov. 3, 2008, Def.'s Mot. Summ J. Ex. 23. Mr. Davis further disclosed that he was being treated with medication and psychotherapy related to his condition. Doctor's Documentation, April 7, 2008, Pl.'s Opp'n Ex. A. On May 20, 2008, Mr. Davis was hospitalized when he became dizzy and fainted, and was diagnosed with vertigo in connection with his depression medication. Discharge Documentation, May 20, 2008, Pl.'s Opp'n Ex. B. Plaintiff asserts that he provided these hospitalization records to his then-supervisor, Lance Kendall. Pl.'s Decl. ¶ 7.

In June 2009, Mr. Davis requested and was granted four days of FMLA leave for in-patient treatment relating to his substance abuse and psychological disorders. FMLA Certification, June 22, 2009, Def.'s Mot. Summ. J. Ex. 25.

Following his February 2010 reinstatement, Mr. Davis was granted FMLA leave or was excused from his absence on the following occasions:

- From July 11, 2010 to July 14, 2010, Mr. Davis was hospitalized in connection to his cocaine abuse and bipolar disorder. Discharge Documentation, July 14, 2010, Pl.'s Opp'nEx. G. Mr. Davis was not marked AWOL on these days.

- From August 8, 2010 to August 9, 2010, Mr. Davis was absent from work for an unknown reason. Leave Request Form, Pl.'s Opp'n, Ex. I. Mr. Davis was granted two days of sick leave for these absences.

- From August 11, 2010 to August 16, 2010, Mr. Davis was hospitalized for alcohol and cocaine abuse. Discharge Summary, Aug. 16, 2010, Pl.'s Opp'n Ex. J. Mr. Davis was not marked AWOL on these dates.

- On August 2, 2010, Mr. Davis requested and was granted FMLA leave from September 2 – 9, 2010, for inpatient treatment. FMLA Leave Request, Pl.'s Opp'n Ex. N; Patient Discharge, Pl.'s Opp'n Ex. P; File Closing Checklist, Pl's Opp'n Ex. O.

**F. The Events Leading up To Mr. Davis's Termination on December 13, 2010**

Mr. Davis was terminated on December 13, 2010, after he was marked as AWOL on eight occasions in 2010: July 7, July 22, November 2, November 10, November 14, December 1, December 8, and December 9. AWOL Notices, Def.'s Mot. Summ. J. Exs. 15-20. Mr. Davis contests each of these AWOLs, arguing that he either (1) properly requested and was authorized for leave on those dates, or (2) was not authorized for leave but should have been granted FMLA or ADA leave as part of his illness.

Plaintiff was documented as AWOL on July 7, 2010. AWOL Letter, Def.'s Mot. Summ. J. Ex. 13. Mr. Davis did not arrive at work on that date. Defendant claims that Mr. Davis did not contact his supervisor, Mr. Eshun, to notify the supervisor of his absence, nor did he answer or return any of his supervisor's phone calls. Test. of John Eshun at 83-86, Tr. of Hr'g before Administrative Judge Steven Wellner, Def's Mot. Summ. J. Ex. 14, July 15, 2013, ECF No. 15. Plaintiff later told Mr. Eshun that he had to "see a physician for personal reasons" but failed to provide a doctor's note when requested to do so. *Id.* at 86. Plaintiff asserts that he had a seven minute conversation with Mr. Eshun on July 6, 2010, informing Mr. Eshun that he could not work the following day due to his illness. Pl.'s Decl. at ¶ 21. Mr. Davis's phone records confirm that he conversed with a number, which he identifies as Mr. Eshun's number, for seven minutes on July 6, 2010. Pl's Opp'n Ex. T at 16. Mr. Davis neither disputes nor confirms Mr. Eshun's request for a doctor's note, nor Defendant's claim that no doctor's note was ever provided.

Plaintiff was next marked AWOL on July 22, 2010. AWOL Letter, Def.'s Mot. Summ. J. Ex. 15. On that date, Defendant asserts that Mr. Davis called his supervisor, notifying him that he would be a couple of hours late due to a "tenant/landlord meeting." Test.John Eshun, at 93. Mr. Eshun approved this delayed arrival, and was expecting Mr. Davis to show up for his shift at approximately 12:30 AM. *Id.* Mr. Davis did not report at that time, and did not respond to Mr. Eshun's "12, 14" calls. *Id.* Mr. Eshun asserts that Mr. Davis's offered explanation after the fact was that "his phone was locked up, he couldn't find his keys." *Id.* at 99. Plaintiff does not dispute that he was authorized to arrive to his shift two hours late due to a landlord/tenant meeting. Davis Decl. ¶ 22. Plaintiff adds, however, that after speaking with Mr. Eshun, he "became dizzy and fainted and was hospitalized." *Id.* Further, Mr. Davis asserts that he did not have his phone with him at the hospital and thus informed Mr. Eshun the following day about his hospitalization. *Id.*

Mr. Davis claims that he provided Mr. Eshun with copies of his medical records from this date. *Id.* The Court notes that these medical records are not in evidence.

Plaintiff was next marked as AWOL on November 2, 2010. AWOL Letter, Def.'s Mot. Summ. J. Ex. 16. Defendant claims that Plaintiff was absent on this day and did not call or notify his supervisor. Def's Mem. Supp. Mot. Summ. J. at 8. Plaintiff claims that on November 2, 2010, he spoke with Mr. Eshun at 2:12 p.m. and 8:27 p.m. to inform him that he could not attend work due to his illness. Davis Decl. ¶ 24. The Court notes that Mr. Davis did receive and make calls at this time, but that the calls were made to two different numbers. Pl.'s Opp'n Ex. T at 18.

Plaintiff was next marked as AWOL on November 10, 2010. AWOL Letter, Def.'s Mot. Summ. J. Ex. 17. Defendant claims that Mr. Davis called around 10:00 p.m., a half-hour before his shift began, to request the night off. Test. John Eshun, at 101. Mr. Eshun says that he denied Plaintiff's request for the night off, and Plaintiff responded that he would be at work that night. *Id.* at 102. Mr. Davis did not arrive at work that night. In his declaration, Plaintiff claims that he called Mr. Eshun at 8:04 p.m. that night to inform him that he would be unable to work due to his condition. Davis Decl. ¶ 25. Mr. Davis's phone records confirm that a call was placed to a number at 8:04 p.m., although this number is again different from every other number identified by Mr. Davis as Mr. Eshun's number. Pl.'s Opp'n Ex. T at 18.

Plaintiff's testimony at an Administrative hearing in front of Judge Wellner contradicts Plaintiff's declaration. At the hearing, Plaintiff testified that he did not work on November 10, 2010 because he had a black-out, Test. of Anthony Davis, Def's Reply Ex. 1 at 164–65, and that he called his supervisor at 3:00 in the morning to let him know what had happened. *Id.* at 165.

Plaintiff was next marked as AWOL on November 14, 2010. AWOL Letter, Def.'s Mot. Summ. J. Ex. 18. Defendant asserts that Mr. Davis did not request time off for November 14, 2010 and did not call or notify his supervisor of his absence. Test. John Eshun at 107. When Mr. Davis failed to appear for his shift, Mr. Eshun says that he called Mr. Davis, but was unable to reach him. *Id.* Mr. Eshun claims that Defendant's proffered explanation for his absence was that there was something wrong with his phone. *Id.* at 108.

Plaintiff disputes this explanation, asserting instead that he had a doctor's appointment during his shift, which began at 10:30 p.m. Davis Decl. ¶ 26. Mr. Davis claims that in early November, he informed Mr. Eshun of a doctor's appointment on November 14, 2010, and that Mr. Eshun verbally approved his leave. Davis Decl. ¶ 26. Mr. Davis has included a physician's record of an appointment, which is dated for November 15, 2010 at 3:33 p.m. Pl's Opp'n Ex. Q. Again, Plaintiff's explanation in his declaration is not consistent with his testimony in the administrative hearing. There, Plaintiff testified that his condition had made him forgetful, and as a result he had locked his keys and cell phone in a locker, and was thus unable to get to work. Test. of Anthony Davis, Def.'s ReplyEx. 1 at 164.

Plaintiff was next marked AWOL on December 1, 2010. AWOL Letter, Def.'s Mot. Summ. J. Ex. 20. Mr. Davis was scheduled to report for his shift at 10:30 p.m. Defendant asserts that when Mr. Davis failed to report at the scheduled time, Mr. Eshun called Mr. Davis several times and left several messages. Def's Mot. Summ. J. Ex. 20. Defendant then asserts that Mr. Davis called Mr. Eshun at 3:12 a.m. to tell Mr. Eshun that he had overslept.

Plaintiff does not dispute that he overslept on that date, but instead asserts that he did so as a result of the medication he was taking. *See* Letter from Anthony Davis to Suzanne Valentine, Def.'s Mot. Summ. J. Ex. 21; Davis Decl. ¶ 27. According to his letter to Ms.

Valentine, Mr. Davis had been experiencing insomnia as a result of a change in medication relating to his depression. Thus, Mr. Davis decided to take sleeping pills that he had been prescribed from a separate and previous treatment for insomnia. *Id.* The Court notes that the drug Mr. Davis references in his letter, Seroquel, is in fact not used to treat insomnia; rather it is used to treat bipolar disorder. *See* http://www.seroquelxr.com/. This medication knocked Mr. Davis out, who woke up groggy at 3:00 a.m., at which time he called Mr. Eshun. Mr. Davis then began to experience side effects from the drug, and went to the emergency room where he was treated for priapism. *Id.*; George Washington Hospital Discharge Instruction, Def's Mot. Summ. J. Ex. 21 at 5. The parties agree that these hospital records were presented to Ms. Valentine on December 7, 2010, along with a letter Mr. Davis wrote explaining his absence.

Mr. Davis was finally marked AWOL on December 8, 2010 and December 9, 2010. AWOL Letter, Def.'s Mot. Summ. J. Ex. 19. Plaintiff asserts that he notified Mr. Eshun that the extreme cold weather enhances his illness and the side-effects related to his medication. Davis Decl.¶ 28. He further states that he had asked Mr. Eshun on multiple occasions to provide him a heavy winter coat, which is generally issued as part of an employee's uniform, and without which Mr. Davis would not be able to work. *Id.* As Mr. Davis explained in his deposition, "[t]he extreme cold had done something to me that morning . . . extreme cold . . . messes with the medication. Had I been able to put my hood on my head, I might have felt better. Had I even had a coat, I might have been able to feel better." Dep. Anthony Davis at 50, Def's Mot. Summ. J. Ex. 10.

Mr. Davis further explains that he "had been waiting a whole year for a coat and some overalls." Test. Anthony Davis at152, Def.'s Mot. Summ., J. Ex. 14. He states that he informed both Mr. Eshun and Ms. Valentine that he would not be at work for two days because he had not

received his winter coat. Davis Decl. ¶ 28. In his declaration, Mr. Davis maintains that he did not come into work on December 8, 2010 and December 9, 2010 because he did not have a winter coat, and that his illness prevented him from working without one.

This declaration is inconsistent with Mr. Davis's testimony at the administrative hearing, where he testified that he did not come to work on December 8, 2010 because: "I was tired of [Mr. Eshun] misleading me about this uniform (the winter coat)….[a]nd I wanted him to know that I was serious about getting a new uniform." Test. Anthony Davis, 162-63, Def.'s Mot. Summ., J. Ex. 14. Yet Mr. Eshun testified at the same hearing that a new, heavier coat was given to Mr. Davis. Test. John Eshun at 177, Def.'s Mot. Summ. J. Ex. 14. Mr. Eshun testified that "[i]t was a new coat. It was given for [Mr. Davis] to keep." *Id.* This coat was in Mr. Davis's possession until it was redeemed upon his termination on December 13, 2010. *Id.* Mr. Davis too concedes that he had received this heavier winter coat, Test. Anthony Davis at 154, but was still unsatisfied because he wanted a coat with his name on it. Test. Anthony Davis at 138. And Mr. Davis feared that once he was given a non-uniform coat, Mr. Eshun would never order a customized coat. *Id* at 154. As Mr. Davis stated, Mr. Eshun is "the type that once he gets you something like that . . . he has no obligation to get me my coat." *Id.*

Mr. Davis also concedes that he never obtained authorization from either Mr. Eshun or Ms. Valentine to miss work on December 8th and 9th. When asked whether Ms. Valentine ever responded to Mr. Davis's request for two days leave, Mr. Davis responded "[n]o she didn't, although I left her my phone number on the message." Dep. Anthony Davis at 56, Def.'s Reply. Ex.2. Mr. Davis similarly concedes that he never received permission from Mr. Eshun for the absence. *Id.* According to Mr. Davis, on December 7, 2010 he said to Mr. Eshun, "I am going to Ms. Valentine to let her know that you have still not ordered my uniform and I am not feeling

well and that -- that I will be taking the next couple of days off." *Id.* When asked what Mr. Eshun said in response, Mr. Davis stated: "[w]ell, it was 7:00. I didn't wait for his response. I just walked out the door after that." *Id.*

### III.  LEGAL STANDARD

#### A.  Summary Judgment Standard

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*, 477 U.S. at 324.  In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. S*ee Anderson*, 477 U.S. at 255.

Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). "If

the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. "Moreover, the non-moving party cannot rely upon inadmissible evidence to survive summary judgment; rather, the non-moving party must rely on evidence that would arguably be admissible at trial." *Manuel v. Potter*, 685 F. Supp. 2d 46, 58 (D.D.C. 2010) (internal citations and quotation marks omitted).

## IV.  ANALYSIS

### A.  Americans With Disabilities Act Claims

#### 1.  Failure to Accommodate

Plaintiff argues that the University violated the Americans with Disabilities Act by denying him reasonable accommodation, which would have allowed him to continue to perform the essential functions of his job. To establish a failure to accommodate claim under the ADA, a plaintiff must proffer evidence from which a reasonable fact-finder could find that (1) he had a qualifying disability within the meaning of the statute, (2) his employer had notice of the disability, (3) with reasonable accommodation, he could perform the essential functions of the position, and (4) he requested an accommodation but the employer denied his request. *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003); *see also* 42 U.S.C. § 12112(a),(b)(5)(A). In the D.C. Circuit, failure to accommodate claims are not subject to the *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802 (1973), burden-shifting framework.  *See Barth v. Gelb*, 2 F.3d 1180, 1185-86 (D.C. Cir. 1993) (explaining that the three part burden shifting framework set up in *McDonnell Douglas Corp.* is not appropriate for reasonable accommodation claims, and that such claims can be tested through the "application of traditional burdens of proof"). *See also Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C. Cir. 1998).

The parties do not dispute that the Plaintiff here has an impairment within the meaning of the ADA, that he has the requisite skills for the job, and that he has suffered an adverse employment action (his termination).

Defendant first argues that Plaintiff's "failure to accommodate" claim fails because Plaintiff has not identified any "reasonable accommodation" that would have allowed him to perform the essential functions of his job. As Defendant correctly notes, "an underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has *requested* an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) (emphasis added); *accord Lee v. D.C.*, 920 F. Supp. 2d 127, 136 (D.D.C. 2013) (citing *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 40 (D.D.C. 2011) for the proposition that the burden lies with the employee to request any needed accommodation). The employee does not necessarily need to make a formal request. *Thompson v. Rice*, 422 F. Supp. 2d 158, 176 (D.D.C. 2006) ("The request for accommodation does not have to be formal, and the words 'reasonable accommodation' do not have to be used, but the employer must be alerted to the condition and the need for accommodation."). However, once an employer has established a fixed set of procedures to request accommodations, the plaintiff-employee's failure to file a request through this procedure could preclude a claim for failure to accommodate. *See Edwards v. EPA*, 456 F. Supp. 2d 72, 103 (D.D.C. 2006); *see also Erbel v. Johnson*, 2007 WL 1387331 at *7, No. 3:04-CV-555; *Cf. Lee v. District of Columbia*, 920 F.Supp.2d 127,137 (D.D.C. 2013) (recognizing *Edwards* but finding that the defendant had not established an accommodations procedure in the instant case).

The Plaintiff here had notice of the employer's accommodation procedures and knew how to take advantage of those procedures. Request for Accommodation form, Def.'s Mot.

Summ. J. Ex. 23. In November 2008, Plaintiff formally notified George Washington University of his disability using this procedure. *Id*. Although the form was labelled as an accommodation request form, Mr. Davis left blank the section labelled "requested accommodation" and stated that the anticipated duration of the accommodation was "unknown." *Id*. Following the filing of this form, George Washington University's Department of Equal Employment Opportunity communicated with Mr. Davis to help set up his health insurance and schedule an appointment with his doctor. Correspondence between Anthony Davis and EEOC Division at GW, Def.'s Mot Summ. J. Ex. 24. In March 2009, the EEO Department again reached out to Mr. Davis asking how he was doing and whether the EEO Department could "assist [Mr. Davis] with anything." *Id*. Nevertheless, Mr. Davis never specified an accommodation. For these reasons, the Court finds that Mr. Davis did not request an accommodation, and thus cannot establish the elements of a failure to accommodate claim under the ADA.

Moreover, even if this Court accepts Plaintiff's asserted requested accommodation, such an accommodation would fail as a matter of law. Plaintiff argues that he "requested accommodation . . when he informed his supervisor as soon as reasonably possible that [he] was unable to report to work due to his illness." Pl.'s Opp'n at 15. Plaintiff asserts that he would have been capable of "performing the essential function[1] of his position if he had been permitted the

---

[1] The parties disagree over whether regular attendance is an essential function of Mr. Davis's housekeeping job. However, as this Circuit and other Circuits have repeatedly noted, regular physical attendance is an essential function of jobs in which the employee must work as a part of a team, *Samper v. Providence St. Vincent Medical Ctr.,* 675 F.3d 1233, 1237 (9th Cir. 2012); *see also, Hypes v. First Commerce Corp.,* 134 F.3d 721, 727 (5th Cir. 1998), and jobs in which the employee must work with on-site equipment to complete the job. *Samper,* 675 F.3d at 1237; *see also E.E.O.C. v. Yellow Freight Sys., Inc.,* 253 F.3d 943 (7th Cir. 2001) (en banc) (dockworker); *Jovanovic v. In–Sink–Erator,* 201 F.3d 894 (7th Cir. 2000) (tool and die maker); *Waggoner v. Olin Corp.*, 169 F.3d 481, 481 (7th Cir. 1999) (production worker); *Corder v. Lucent Techs., Inc.,* 162 F.3d 924 (7th Cir. 1998) (telephone customer support); *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191 (4th Cir. 1997) (computer

reasonable accommodation of being able to call in when he was ill and make up his shift later in the week." Pl.'s Opp'n at 14. Although the ADA defines "reasonable accommodation" to include "part-time or modified work schedules," Mr. Davis's requested accommodation is too open-ended and is thus unreasonable as a matter of law. 42 U.S.C. § 12111(9)(B); *see also Langon v. HHS*, 959 F.2d 1053, 1060–61 (D.C. Cir. 1992); *McNair v. District of Columbia*, 2014 WL 242913, at *4 (D.D.C. Jan. 23, 2014) ("It is true that an employer must consider telecommuting as a potential form of reasonable accommodation.").

    As courts in this district have explained, whether a modified work schedule constitutes a reasonable accommodation will depend on the nature of the position for which the employee is requesting the accommodation. For instance, in *Carr v. Reno*, the plaintiff requested, *inter alia*, a flexible arrival time to work, because she had an ear disability that caused her periodic dizziness, nausea, and vomiting, and that made it difficult for her to make it into work at her scheduled 8:00 a.m. arrival time. 23 F.3d at 527, 529, 531. Her employer denied that request because of a daily 4:00 p.m. deadline that the employer had to make, that it would not be able to if Ms. Carr could not arrive to work at 8:00 a.m. each day and work a full eight-hour shift. *Id.* at 530. The court held that "to require an employer to accept an open-ended 'work when able'

---

consultant); *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755 (5th Cir. 1996) (mechanic); *Jackson v. Veterans Admin.,* 22 F.3d 277 (11th Cir. 1994) (housekeeping aide); *Carr v. Reno,* 23 F.3d 525 (D.C. Cir. 1994) (coding clerk under the Rehabilitation Act); *Law v. U.S. Postal Serv.,* 852 F.2d 1278 (Fed. Cir. 1988) (mail handler under the Rehabilitation Act).

    Plaintiff's housekeeping position, whose tasks include mopping rooms and hallways, washing windows, polishing furniture, and vacuuming, requires Mr. Davis to work with on-site equipment. Job Classification Description, Def.'s Mot. Summ. J. Ex. 4. It seems obvious, in fact, that Mr. Davis could not complete the tasks required for his job on those days that he did not come to work. This case thus differs significantly from cases such as *Langon v. HHS*, where the plaintiff's modified schedule could be accommodated because she could perform her job by teleworking on days she was unable to come into work. 959 F.2d 1053, 1060–61 (D.C. Cir. 1992). The Court thus easily finds that regular attendance is an essential function of Plaintiff's housekeeping position.

schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd proportions and imperil the effectiveness of the employer's public enterprise." *Id.* at 531. The daily deadline, in other words, was the critical element of her position that rendered the employee's proposed accommodation of a flexible work time unfeasible. *See Breen v. Dep't of Transp.,* 282 F.3d 839, 843 (D.C. Cir. 2002).

By contrast, in *Langon*, the plaintiff, who suffered from multiple sclerosis, requested that she be allowed to perform her job as a computer programmer from home. *See Langon*, 959 F.2d at 1054–55. The court found that summary judgment for the employer was inappropriate because there was a genuine dispute of material fact as to whether the plaintiff could have performed the essential functions of her job—computer programming—at home. *See id.* at 1061. Similarly in *Breen*, the court found summary judgment for the employer inappropriate because there was no "critical element" to the plaintiff's position that made her proposed alternative work schedule, which included an "hour of quiet time after business hours to do solid filing," incompatible with the essential functions of her position as a file clerk. 282 F.3d at 840, 843.

Lower courts have interpreted *Langon*, *Carr*, and *Breen* as establishing a dichotomy wherein a specific and well-defined accommodation is deemed reasonable, and an erratic and unpredictable accommodation, such as an open-ended "work whenever you want schedule" is unreasonable as a matter of law. *See, e.g.*, *Solomon v. Vilsack*, 845 F. Supp. 2d 61, 71 (D.D.C. 2012) ("D.C. Circuit precedent makes clear that an employee's request to work whenever he or she wants is unreasonable as a matter of law. On the other hand, specific and well-defined accommodations are not unreasonable.") (internal quotation marks and citations omitted)); *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 26 n.21 (D.D.C. 2002) (explaining that a request "to work only on the infrequent and unpredictable occasions" that the plaintiff felt able "was nothing

like the specific and well-defined accommodations at issue in *Langon* and *Breen*, and thus was not reasonable"). Other courts have also agreed with this legal proposition. *See Fisher v. Vizioncore, Inc.*, 429 F. App'x 613, 616 (7th Cir. 2011) (noting that "an open-ended schedule with the privilege to miss workdays frequently and without notice" is not reasonable as a matter of law); *E.E.O.C. v*, 253 F.3d at 948 (explaining that "the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability") (quoting *Waggoner*, 169 F.3d at 484).

Mr. Davis's proposed accommodation closely resembles an open-ended "work whenever you want" schedule, which is unreasonable as a matter of law. Mr. Davis could not predict when his disability would require him to stay at home, and he could not predict the number of hours or days he would be affected by a specific episode. *See e.g.*, Pl.'s Opp'n 6-7 (noting that Mr. Davis occasionally experienced side effects relating to his medication); Discharge Order from July 11, 2010, Pl.'s Opp'n Ex. G (unplanned four day absence for detoxification); Emergency Room Discharge from Aug. 11, 2010, Pl.'s Opp'n. Ex. J (unplanned emergency hospitalization for alcohol and cocaine abuse); BH Patient Discharge Instructions, Pl.'s Opp'n Ex. N (stating that the doctors are "unable to predict" the frequency of Plaintiff's flare-ups or the duration of his incapacity); Letter from Anthony Davis to Ms. Valentine, Pl.'s Opp'n Ex. R (explaining to Ms. Valentine that he had originally overslept due to his medication and then had to be rushed to the emergency room for other side effects due to his medication). Moreover, unlike in *Langon*, Mr. Davis had a daily deadline (he had to complete his cleaning tasks before the University opened), and he was required to be on site in order to complete the task. Def.'s Mot. Summ. J. Ex. 4.

Mr. Davis nevertheless argues that his requested accommodation is reasonable because his absence was not an undue burden for the employer to accommodate. Pl.'s Opp'n at 15.

Plaintiff states that he has worked when "other employees have been absent unexpectedly; on these occasions, there was minimal additional burden on other employees . . . [and] whenever the house-keeping department has been short-staffed in the past, the work was completed within all the time constraints." *Id.* Plaintiff offers no support for this declaration other than his own anecdotal experience on the matter, *Id.*; *see also* Pl.'s Decl. ¶ 32. Instead, Mr. Davis relies on *Samper v. Providence St. Vincent Medical Ctr.,* 675 F.3d 1233, 1236 (9th Cir. 2012) to provide support for his contention that unexpected absences do not have a major effect on GW's housekeeping operations. The Plaintiff notes that in *Samper*, the Court found that the "defendant-employer had provided sufficient accommodation" by allowing a neonatal intensive care nurse to make up her unexpected absences later in the week. Pl.'s Opp'n at 15.

While it is true that the defendant-employer in *Samper* allowed the plaintiff to make up missed work later in the week, the court never holds that such an accommodation *must* be provided under the ADA. *Samper*, 675 F.3d at 1240. In fact, the *Samper* court describes the employer's efforts to accommodate Ms. Samper as "Herculean," adding, "the fact that [the employer] had infinite patience with regard to [the employee's] poor attendance does not necessarily mean that every company must put up with employees who don't come to work." *Id.* (citing *E.E.O.C.*, 253 F.3d at 948 ).

Moreover, the court in *Samper* considers and rejects an argument similar to the one Mr. Davis makes here — that because the employer is able to accommodate *some* unplanned absences, a few additional unplanned absences will hardly be an additional burden on the employer. *Samper*, 675 F.3d at 1240. "[T]his approach ignores recognition of employer needs and would gut reasonable attendance policies." *Id.* In establishing their attendance policy, employers balance "the realities of illness, family matters and other unplanned emergencies

19

faced by its employees" against the needs for the employees' services. *Id.* Although it may seem to Plaintiff that his absences had only a minimal effect on George Washington's housekeeping operation, his perceptions are myopic and do not account for, or rebut, George Washington's principal claim: that unplanned absences are a hardship to its operations.

Indeed, George Washington University maintains that "regular attendance is an essential part of the service worker position. When an employee fails to report to work, other employees' schedules have to be adjusted, essential work is delayed or not performed, and/or overtime may have to paid." Def.'s Mot. Summ. J. at 5; Valentine Decl. ¶ 8, Def.'s Mot. Ex. 3; Facilities Service Working Rules, Def.'s Mot. Ex. 5. According to George Washington University's attendance policy, employees are not only expected to be at work "on time and on a regular basis" but are also required to follow the "established working schedules, which includes starting time, quitting time, and mealtime." Facilities Service Working Rules, Def.'s Mot. Ex. 5.. George Washington takes this attendance policy seriously and terminates employees for fewer AWOL hours than what Mr. Davis accrued. Valentine Decl. ¶ 16. Even Plaintiff was baffled that he was able to keep his job given the number of AWOL days he had accrued. Dep. Anthony Davis at 133, May 15, 2013, Def.'s Mot. Summ. J. Ex. 10. This is particularly true in light of the LCA, which allowed the University to terminate the Plaintiff even after one instance of being absent without his supervisor's permission. LCA ¶ 3, Def.'s Mot. Summ. J. Ex. 8.

Because this Court finds that Plaintiff did not properly request an accommodation, and that Plaintiff's requested accommodation is nevertheless unreasonable as a matter of law, the Court grants summary judgment to the Defendant on the failure to accommodate claim.

## 2. Discriminatory Discharge

Plaintiff next argues that Defendant terminated him because of his asserted disability, in violation of the ADA. Defendant offers a "legitimate, nondiscriminatory reason" for terminating Mr. Davis —that Mr. Davis was AWOL at least once between February 3, 2010 and February 3, 2011, which gave the University grounds to terminate Mr. Davis under the LCA.

Claims of discrimination under the ADA are analyzed using the familiar burden shifting framework articulated in *McDonnell Douglas Corp v. Green*, 441 U.S. 792, 802 (1973). *See AKA v. Washington Hosp. Center*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (applying the *McDonnell-Douglas* framework to an ADA discrimination claim); *DeLuca v. Winer Indus., Inc*., 53 F.3d 793, 797 (7th Cir.1995) (finding that the *McDonnell Douglas* framework applies to ADA cases).

To establish a *prima facie* case of discriminatory discharge, plaintiff ordinarily must show that (1) he belongs to a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination. *George v. Leavitt*, 407 F.3d 405,412 (D.C. Cir. 2005). A plaintiff may satisfy the third prong of this test by "demonstrating that [ ]he was treated differently from similarly situated employees who are not part of the protected class." *Id.*

The plaintiff may prove his *prima facie* case through direct evidence, or where, as here, the plaintiff cannot produce direct evidence of discrimination, through the three-part burden-shifting framework laid out in *McDonnell Douglass Corp.*, 411 U.S. at 792. Under this framework, the plaintiff must initially prove his *prima facie* case by a preponderance of the evidence. *Id.* at 802. Once the plaintiff succeeds in making this *prima facie* showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  In the final

step under *McDonnell Douglas*, the plaintiff must prove that the employer's proffered explanation is a pretext masking prohibited discrimination. *Burdine*, 450 U.S. at 256.

This Circuit has ruled, however, that "[i]n a . . . suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the district court should determine whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on the basis of a protected trait or activity. *Id.* Because the University has asserted a non-discriminatory reason for Plaintiff's termination —that Plaintiff was AWOL on at least one occasion between February 3, 2010 and February 3, 2011, and was fired in accordance with the LCA —this Court will only assess whether Plaintiff's evidence can demonstrate that the Defendant's proffered reason is merely pretext to conceal discrimination.

It is important to note that even if a court believes that the employer made a poor personnel decision, the court may not second-guess that decision absent demonstrably discriminatory motive. *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982). "Filing a Title VII action . . . is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination." *Gregg v. Hay-Adams Hotel*, 942 F.Supp. 1, 9 (D.D.C. 1996).

As the University has asserted a non-discriminatory reason for Plaintiff's termination, the burden shifts to the Plaintiff, who must produce sufficient evidence to demonstrate that the University's proffered reason is pretext for discrimination. *Brady* 520 F.3d at 494. Plaintiff

responds to the University's proffered justification by making only one argument: That Plaintiff complied with all leave policies. Pl.'s Opp'n at 16-17.

The Court does not believe it needs to analyze all of the AWOLs in dispute here. The Court finds that Plaintiff cannot raise a dispute of material fact to the December 8 and 9, 2010 AWOLs, which is sufficient to defeat Plaintiff's sole argument of pretext — that Plaintiff, in every AWOL instance, complied with the University's leave policies. Thus, the Court analyzes only the facts in dispute from the December 8th and 9th AWOLs. *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 920 (7th Cir. 1996) (holding that when an employer proffers several non-discriminatory reasons to justify its termination decision, Plaintiff must raise an issue of fact regarding each of the reasons proffered); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) (holding that when an employer offers multiple *independent* reasons for the termination, each of which may stand alone as non-discriminatory justifications, Plaintiff must raise an inference of pretext as to *each* proffered justification).

Mr. Davis was marked AWOL on December 8, 2010 and December 9, 2010. AWOL Letter, Def's Mot. Summ. J. Ex. 19. Plaintiff asserts that he notified Mr. Eshun that the extreme cold weather enhances his illness and the side-effects related to his medication. Davis Decl. ¶ 28. He further states that he had asked Mr. Eshun on multiple occasions to provide him a heavy winter coat, which is generally issued as part of an employee's uniform, and without which Mr. Davis would not be able to work. *Id.* As Mr. Davis explained in his deposition, "[t]he extreme cold had done something to me that morning . . . extreme cold . . . messes with the medication. Had I been able to put my hood on my head, I might have felt better. Had I even had a coat, I might have been able to feel better." Dep. Anthony Davis at 50, Def's Mot. Summ. J. Ex. 10. Mr. Davis further explains that he "had been waiting a whole year for a coat and some overalls."

Test. Anthony Davis at 152, Def.'s Mot. Summ., J. Ex. 14. He states that he informed both Mr. Eshun and Ms. Valentine that he would not be at work for two days because he had not received his winter coat. Davis Decl., ¶ 28. In his declaration, Mr. Davis maintains that he did not come into work on December 8, 2010 and December 9, 2010 because he did not have a winter coat, and that his illness prevented him from working without one.

This declaration is inconsistent with Mr. Davis's testimony at the OAH administrative hearing, where he testified that he did not come to work on December 8, 2010 because: "I was tired of [Mr. Eshun] misleading me about this uniform (the winter coat) . . . . [a]nd I wanted him to know that I was serious about getting a new uniform." Test. Anthony Davis at152-53, Def.'s Mot. Summ., J. Ex. 14. Yet Mr. Eshun testified at the same hearing that a new, heavier coat was given to Mr. Davis. Test. John Eshun, at 177, Def.'s Mot. Summ., J. Ex. 14. Mr. Eshun testified that "[i]t was a new coat. It was given for [Mr. Davis] to keep." *Id.* This coat was in Mr. Davis's possession until it was redeemed upon his termination on December 13, 2010. *Id.* Mr. Davis too concedes that he had received this heavier winter coat, Test. Anthony Davis, at 154, but was still unsatisfied because he wanted a coat with his name on it. Test. Anthony Davis, at 138. And Mr. Davis feared that once he was given a non-uniform coat, Mr. Eshun would never order a customized coat. *Id.* at 154. As Mr. Davis stated, Mr. Eshun is "the type that once he gets you something like that . . . he has no obligation to get me my coat." *Id.*

Mr. Davis also concedes that he never obtained authorization from either Mr. Eshun or Ms. Valentine to miss work on December 8th and 9th. When asked whether Ms. Valentine ever responded to Mr. Davis's request for two days leave, Mr. Davis responded "[n]o she didn't, although I left her my phone number on the message." Dep. Anthony Davis at 56, Def.'s Reply. Ex.2. Mr. Davis similarly concedes that he never received permission from Mr. Eshun for the

absence. *Id.* According to Mr. Davis, on December 7, 2010 he said to Mr. Eshun, "I am going to Ms. Valentine to let her know that you have still not ordered my uniform and I am not feeling well and that -- that I will be taking the next couple of days off." *Id.* When asked what Mr. Eshun said in response, Mr. Davis stated: "[w]ell, it was 7:00. I didn't wait for his response. I just walked out the door after that." *Id.*

Plaintiff argues that he was improperly documented as AWOL on these dates because (1) he properly requested and was granted leave by the Defendant; and (2) even if he was not authorized for leave prior to his absence, he was absent due to his ADA-qualifying disability, which ought to have been accommodated.

Whether Plaintiff's absences violated the LCA will turn on whether Plaintiff properly followed the University's call-in procedures, or whether Plaintiff was improperly denied an accommodation that would help him do his job. *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (noting that the fourth prong under a failure to accommodate analysis is that the employer denied the requested reasonable accommodation); *see also* 42 U.S.C. § 12112(a), (b)(5)(A) (same). After all, although the LCA allows the Defendant to terminate Mr. Davis if he is absent even once without authorization, it does not allow the Defendant to refuse Mr. Davis a properly requested reasonable accommodation. *Id.*

The Court first notes that although it is required to consider the facts in the light most favorable to the non-movant when determining a motion for summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), a plaintiff opposing summary judgment "cannot create a question of fact by submitting an affidavit that contradicts [his] prior sworn testimony," unless he "can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007)

(citations omitted); *see also Gurrara v. District of Columbia*, 881 F. Supp. 2d. 143, 150 n.5 (D.D.C. 2012).

Such is the case here. At the administrative hearing, Mr. Davis testified that he did not come into work on December 8, 2010 because he was tired of Mr. Eshun misleading him about his winter coat, and wanted to make a point that he was serious about receiving a winter coat. Test. Anthony Davis at152-53, Def.'s Mot. Summ., J. Ex. 14. During this hearing Mr. Davis did not discuss his illness, or that the side effects of his medication were amplified due to the extreme cold. In his declaration, however, Mr. Davis asserts that he was absent on those days not because he wanted to make a point to Mr. Eshun, but rather because his illness prevented him from working in the extreme cold without a heavy winter coat. Davis Decl. ¶ 28. The Court finds Mr. Davis's sworn testimony to be at odds with his declaration. Mr. Davis thus cannot establish a dispute of material fact that the Defendant improperly documented him as AWOL on December 8th and 9th.

Even if the Court ignores Plaintiff's inconsistencies, and takes as true that Plaintiff's ADA qualifying disability prevented him from working in the extreme cold without a heavy winter coat, Plaintiff still cannot establish that he was improperly documented as AWOL on December 8th and 9th. First, Plaintiff has conceded that he never received authorization for his absences from either Ms. Valentine or Mr. Eshun. Dep. Anthony Davis, at 56 (stating that he never heard from Ms. Valentine, although he left her a message requesting time off, and that he did not wait to hear Mr. Eshun's response after informing him of his impending absences). As a result, Plaintiff cannot establish that he properly requested and was granted leave by the Defendant on those dates.

Plaintiff could alternately establish that he was a "qualified individual" with a disability (i.e. could perform the essential functions of his job with a reasonable accommodation), that he requested that reasonable accommodation (here a heavy winter coat), but was denied the accommodation. *See* 42 U.S.C. §§ 12112(b)(5)(A), 1211(8). This would establish that the University was in direct violation of the ADA by denying Plaintiff a winter coat, and that Plaintiff was thus improperly documented as AWOL on December 8th and 9th. *See* 42 U.S.C. §§ 12112(b)(5)(A), 1211(8); *see also Aka v. Washington Hosp. Center*, 156 F.3d at 1300.

Unfortunately for Plaintiff, this argument cannot get off the ground. Even if Mr. Davis properly requested the heavy winter coat as an accommodation, and the Court found that accommodation to be reasonable, the University *granted* Mr. Davis's accommodation. *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (noting that the fourth prong under a failure to accommodate analysis is that the employer denied the requested reasonable accommodation); *see also* 42 U.S.C. § 12112(a), (b)(5)(A) (same). Mr. Davis argues that a hood or a heavy winter coat would have mitigated the effects of the extreme weather on his disability, and thus would have enabled him to complete his job.[2] Dep. Anthony Davis at 50, Def's Mot. Summ. J. Ex. 10. However, Mr. Davis does not directly dispute that Mr. Eshun did in fact provide him with a winter coat. Test. Anthony Davis at 154. Accordingly, regardless of whether a winter coat is a reasonable accommodation, it was all that Mr. Davis requested or needed in order to complete his job, and it was a request Mr. Eshun granted. Because he did in fact receive a heavy winter coat (albeit one without his name), Mr. Davis cannot establish that he was absent due to his

---

[2] Although Mr. Davis does not say so explicitly, it seems that Mr. Davis believes that a winter coat would have been sufficient to complete his job. Insofar as Mr. Davis is asking for leave any time the weather affects his medication, and given that the District of Columbia frequently experiences cold weather for winter months, the Court finds the request to fall within the Plaintiff's general request for a "work whenever you please" schedule, and would find the accommodation unreasonable as a matter of law. *See* Supra Part IV.A.1.

disability, and thus cannot establish that he was improperly documented as AWOL on December 8th and 9th.

### 3. Hostile Work Environment

Plaintiff next argues that the University subjected Mr. Davis to a hostile work environment "permeated with discriminatory intimidation and insult," in violation of the ADA. Although judges in this district have long assumed, without holding, that the ADA provides a cause of action for hostile work environment claims, this Circuit has never explicitly recognized such a cause of action. See *Kuraner v. Mineta*, 2001 WL 936369 (D.C. Cir. July 10, 2001) (assuming without deciding the existence of the cause of action and affirming judgment for the defendant in *Kuraner v. Slater*, Civ. A. 98–0576 (D.D.C. Sept. 13, 2000)); *see also Pantazes v. Jackson*, 366 F.Supp.2d 57, 71 (D.D.C. 2005) (denying summary judgment on an ADA hostile work environment claim because a jury could reasonably find the acts alleged to be "sufficiently severe, pervasive and abusive to alter the conditions of [plaintiff's] employment, thereby creating an abusive working environment"); *Henry v. Guest Services, Inc.*, 902 F. Supp. 245, 252 n. 9 (D.D.C. 1995) ("This Court accepts that the Title VII standard—harassment so severe or pervasive as to alter the conditions of employment and create an abusive working environment—is applicable to harassment allegations made under the ADA.").

Moreover, several other circuits have permitted hostile work environment claims under the ADA, by finding significant similarities between the purpose and language of Title VII and the ADA. *Fox v. Gen'l Motors Corp.*, 247 F.3d 169, 176 (4th Cir.2001) (finding the parallel language of Title VII and the ADA to warrant the same interpretation, and concluding that jury verdict on ADA hostile environment claim was supported by the evidence); *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir.1999); *Walton v. Mental Health Ass'n of Southeastern*

*Pa.*, 168 F.3d 661, 667 n. 2 (3d Cir.1999) (collecting cases that presume the existence of such a cause of action and stating that the court found no cases holding that the claim did not exist); *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir.1998) (assuming without deciding that cause of action exists); *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir.1998) (discussing merits of evidence in support of claim); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir.1998) (assuming without deciding that cause of action exists).

The parties here do discuss whether the ADA provides a cause of action for a hostile work environment claim. This Court thus also assumes, without holding, that such a cause of action exists, and utilizes the Title VII standards to analyze the claim.

As a threshold matter, Defendant argues that the Plaintiff's hostile work environment claim should fail because Mr. Davis has not properly exhausted the administrative remedies for a hostile work environment claim. The Plaintiff agrees that he did not use the term "hostile work environment" in his formal EEO complaint, but argues that regardless, he adequately exhausted his administrative remedies.

In some ways, "the exhaustion of administrative remedies requirement is less stringent for hostile work environment claims than for discrete claims of discrimination or retaliation." *Adams v. D.C.,* 740 F. Supp. 2d 173, 188 n.11 (D.D.C. 2010); *see also Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 (2002) (concluding that a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period"); *Nurriddin v. Goldin,* 382 F. Supp. 2d 79, 107 n. 10 (D.D.C. 2005) (recognizing that "[u]nlike discrete claims of discrimination and retaliation, the exhaustion requirement on a hostile work

environment claim is less stringent ... [and the p]laintiff need only have filed an EEOC complaint alleging some of the claims that comprise the hostile work environment claim"). Additionally, "a plaintiff may adequately exhaust administrative remedies without specifically alleging a hostile work environment claim in his administrative complaint." *Adams*, F. Supp. 2d. at 188; *Roberson v. Snow*, 404 F. Supp. 2d 79, 96 (D.D.C. 2005) (citing *Jones v. Billington*, 12 F. Supp. 2d 1, 7 (D.D.C. 1997)).

In order to determine whether a hostile work environment claim is properly exhausted, the Court must determine whether the Plaintiff's hostile work environment claims are "like or reasonably related to the allegations of the charge and grow[s] out of such allegations." *Whorton v. WMATA*, 924 F. Supp. 2d 334, 348 (D.D.C. 2013); *see also Roberson v. Snow*, 404 F. Supp. 2d 79, 96 (D.D.C. 2005); *Jones v. Billington*, 12 F. Supp. 2d 1, 7 (D.D.C. 1997); *accord Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). "In determining what claims have been exhausted . . . courts in this district have looked at informal intake questionnaires, and parties' letters to the EEOC discussing the substance of the claims." *Wade v. Dist. of Colum.*, 780 F. Supp. 2d 1, 14 (D.D.C. 2011) (internal citations omitted).

Courts in this district have consistently found that the plaintiff adequately exhausted their hostile work environment claim when the asserted claim "is not based on conduct that is different from that alleged in the EEOC charge." *Billington*, 12 F. Supp. 2d at 7; *see also Wade*, 780 F. Supp. 2d at 12 ("a hostile work environment claim that is based on the same conduct alleged in the EEOC charge has been exhausted."); *Langley v. Napolitano*, 677 F. Supp. 2d 261, 268 (D.D.C. 2010) (finding exhaustion when "Plaintiff complained in her EEO complaint of the very same conduct that she now asserts forms the basis of her hostile work environment claim in this lawsuit"); *Na'im v. Rice*, 577 F. Supp. 2d 361, 372 (D.D.C. 2008) (finding adequate

exhaustion for plaintiff's hostile work environment claim "[b]ecause the plaintiff need not specifically allege a hostile work environment claim, and because she supports her hostile environment claim with factual allegations also contained in her . . . formal EEOC complaint"). Defendant argues that Plaintiff only challenged his termination and alleged denial of reasonable accommodation in his EEOC complaint, without additionally alleging facts to show that the workplace was "permeated" with disability-based discrimination. Def.'s Mot. Summ. J. at 24.

In Plaintiff's EEOC intake questionnaire, Plaintiff alleged the following facts in addition to his claim of discriminatory termination and failure to accommodate: (1) that his supervisor refused to take Mr. Davis's doctor's documents, (2) that Mr. Davis was denied a cold weather coat by his supervisor, although other employees had been issued those coats, (3) that Mr. Davis's supervisor marked Plaintiff as AWOL on eight occasions, even though he had followed the University's leave policy, and (4) that Mr. Davis was denied non-monetary benefits given to other employees, such as vacation days, incentives, and movie tickets. EEOC Intake Questionnaire, Pl's Opp'n Ex. U, Aug. 15, 2013, ECF No. 18. These are the same facts that Plaintiff now relies on to establish his hostile work environment claim. *See* Pl.'s Opp'n at 18-19; *Whorton,* 924 F. Supp. 2d at 348 (explaining that hostile work environment "claims must arise from 'the administrative investigation that can [be] reasonably expected to follow the charge of discrimination"). As Plaintiff's hostile work environment claim relies on the same conduct alleged in his EEOC intake questionnaire and formal complaint, allegations concerning such conduct "could reasonably be expected upon investigation to lead to a hostile work environment claim." *Park v. Howard University*, 71 F.3d 904, 908 (D.C. Cir. 1995). Thus, the Court finds that Plaintiff properly exhausted a hostile work environment claim.

This brings the Court to the merits of the hostile work environment claim. However, the Court finds the merits of the hostile work environment claim to have been insufficiently briefed. Accordingly, the Court will deny summary judgment **without prejudice** on Defendant's motion for summary judgment as to the hostile work environment claim, and request supplemental briefing on the merits of this claim.

### B.  Federal Family and Medical Leave Act

The Federal Family and Medical Leave Act (FMLA) requires a covered employer to give an "eligible employee" twelve weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform" his job. 29 U.S.C. § 2612(a)(1)(D). A serious health condition is "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." *Id* § 2611(11).

The parties assume for the sake of argument that Plaintiff has a "serious" health condition that renders Plaintiff unable to work on the nights he was classified as AWOL. Instead Defendant argues that summary judgment should be granted on Mr. Davis's FMLA claims for three reasons: (1) Mr. Davis was not an "eligible employee" under the FMLA because he did not work 1,250 hours in the 12-month period preceding his termination; (2) Mr. Davis did not adequately notify Defendants of his need for FMLA leave on the nights that he was AWOL; and (3) Mr. Davis has failed to adduce sufficient evidence of FMLA retaliation to defeat summary judgment. The Court will consider each argument in turn.

1. Plaintiff is not an "eligible employee" under the FMLA because he has not worked 1,250 hours preceding the commencement of his leave

Defendant first claims that Mr. Davis is not an "eligible employee" under the FMLA because Mr. Davis did not work for 1,250 hours in the previous 12-month period, and thus is not eligible for FMLA leave. Plaintiff responds arguing that (1) Defendant incorrectly calculated the 1,250 hours from the date of Plaintiff's termination, rather than from the commencement of leave; (2) Plaintiff's hours should be calculated as intermittent leave, beginning from his first request for FMLA leave on June 22, 2009; and (3) Defendant incorrectly excluded from their calculation the time Plaintiff would have worked while "unlawfully terminated" from August 24, 2009 to February 4, 2010. Pl.'s Opp'n 19–22.

The FMLA states that "[a]n eligible employee is an employee of a covered employer who . . . has been employed for at least 1,250 hours of service during the 12-month period immediately preceding the *commencement of the leave.*" 29 C.F.R. § 825.110(a)(2) (emphasis added); *see also Butler v. Owens-Brockway Plastic Prods., Inc.*, 199 F.3d 314, 315 (6th Cir. 1999) (holding that the 1,250 hours of service must be computed from the date of commencement of leave rather than the date of the adverse action that violated the Act).

"The determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start." 29 C.F.R. § 825.110(d). Thus, as Plaintiff correctly notes, the applicable date from which this Court must calculate the hours of service requirement would be from the date that Plaintiff first commenced leave, not the date from which Plaintiff was terminated from employment.

Plaintiff argues that his FMLA leave commenced on June 22, 2009 — the day that Plaintiff first requested intermittent leave from the Defendant for a qualifying condition. It is true that the FMLA does allow for "intermittent leave," which is defined as "leave taken in separate

blocks of time due to a single qualifying reason." §§ 825.203, 825.800 (emphasis added). Department of Labor Wage and Hour Division, Opinion Letter Family & Med. Leave Act (FMLA), FMLA-112, 2000 WL 33157366 (Sept. 11, 2000). However, once the Plaintiff has qualified and been granted "intermittent leave," such leave "cannot be taken 'forever' on the basis of one leave request. Instead, the statute grants an employee twelve weeks of leave per twelve-month period, not indefinitely." Opinion Letter Family & Med. Leave Act (FMLA), FMLA-112 (citing to *Barron v. Runyon*, 11 F. Supp. 2d, 676, 683 (E.D. Va. 1998)). As the FMLA board notes:

> [T]he 1,250-hour eligibility test is applied only once, on the commencement of a series of intermittent absences, *if all involve the same FMLA-qualifying serious health condition during the same 12-month FMLA leave year*. The employee in such a case remains entitled to FMLA leave for that FMLA reason *throughout that 12-month period*, even if the 1,250-hour calculation is not met at some later point in the 12-month period during the series of related intermittent absences.

Opinion Letter Family & Med. Leave Act (FMLA), FMLA-112 (emphasis added).

Under these principles, Plaintiff's first request for intermittent leave in June 22, 2009 would qualify Plaintiff as an eligible employee only until June 22, 2010, and only for the disability he specified in 2009 — substance abuse. Def's Mot. Summ. J. Ex. 25. However, Plaintiff's 2010 AWOLs, which Plaintiff argues should have been considered requests for FMLA leave, all occurred after June 22, 2010. *See* Def's Mot. Summ. J. Exs. 13, 15–20. The earliest AWOL was recorded on July 7–8, 2010. Def's Mot. Summ. J. Ex. 13. In addition, these sick days were, by Plaintiff's own account, unrelated to his substance abuse, and were instead related to his psychological condition, and the side effects from the medication he took for that illness.[3]

---

[3] "In early July 2010, Mr. Davis again began experiencing severe side-effects and other difficulties relating to his depression medication." Pl.'s Opp'n to Defs.' Mot. Summ. J.,7, Aug, 15, 2013, ECF No. 18; Pl's Decl. ¶ 20 Ex. 2, Pl's Opp'n. "On July 6, 2010…[Mr. Davis] had a seven-minute conversation with . . . Mr. Eshun and informed Mr. Eshun that he could not work on July 7, 2010 due to his illness and complications related to his [depression] medication." Pl.'s

As a result, June 22, 2009 is a wholly inappropriate date from which this Court should begin calculating Plaintiff's hours of service worked.

The Court is now left with the task of determining the date from which Plaintiff's hours of services should be calculated. As neither party has identified an alternate date, the Court identifies and analyzes three alternatives: (1) July 7, 2010 —the date Mr. Davis was first recorded as AWOL; (2) July 11, 2010—the first time since the lapse of the June 22, 2009 intermittent leave that Mr. Davis was again hospitalized for substance abuse and for bipolar disorder; or (3) August 2, 2010 —the date on which Mr. Davis again officially requested FMLA leave after the lapse of his June 22, 2009 intermittent leave. As analyzed below however, regardless of the date on which Plaintiff's intermittent leave commenced, Plaintiff did not work the minimum 1,250 hours to qualify as an employee eligible for FMLA leave.

Before the Court can accurately calculate the hours, however, it must first determine whether the calculations must include the hours Plaintiff would have worked if not for his "unlawful termination" between August 24, 2009 and February 4, 2010. Pl.'s Opp'n at 19–22. Plaintiff argues that the "Defendants discriminated against Mr. Davis when they terminated him in August 2009 almost immediately after he took FMLA leave in late July 2009 due to his

---

Opp'n 7; Pl's Decl. ¶ 18. "On July 22, 2010 . . . Mr. Davis became dizzy, fainted, and was hospitalized . . . in connection with his condition." Pl's Opp'n 7; Pl's Decl. ¶¶ 22-23. "Mr. Davis requested sick leave from Mr. Eshun on November 2, 2010 . . . due to his illness and symptoms." Pl.'s Opp'n 8; Pl's Decl. ¶ 25. "On November 10, 2010 . . . Mr. Davis told Mr. Eshun that he was unable to work due to his condition and symptoms." Pl.'s Opp'n 8; Pl's Decl. ¶ 25. Mr. Davis was hospitalized on November 10, 2010, due to a side-effect from his depression medication. Pl.'s Opp'n Ex. T. "On November 14, Mr. Davis informed Mr. Eshun in person that he had a doctor's appointment scheduled for November 14, 2010 and gave him an appointment card." Pl.'s Opp'n 8; Pl's Decl. ¶ 26. "On December 1, 2010, Mr. Davis missed work due to side effects from his medication." Pl.'s Opp'n8; Pl's Decl. ¶ 27. "On December 6, 2010, Mr. Davis informed Mr. Eshun that cold weather enhanced his illness and the side effects of his medication. Mr. Davis told Mr. Eshun that, as a result of the cold weather and the fact that he had not received a winter coat, Mr. Davis would not be able to come into work for a couple of days." Pl.'s Opp'n 8–9; Pl's Decl. ¶ 28.

disability." Pl.'s Opp'n at 22. Thus, Plaintiff argues that the hours that he would have worked if not for this "unlawful termination" should be included when determining the "hours of service" requirement.

While the FMLA itself does not define "hours of service," it does specify that "[f]or purposes of determining whether an employee meets the hours of service requirement specified in subparagraph (A)(ii), the legal standards established under section 207 of [the Fair Labor Standards Act] shall apply. 29 U.S.C. § 2611(C). Section 207 of the Fair Labor Standards Act (FLSA) excludes from the calculation those hours when no work is performed due to "vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause." Fair Labor Standards Act, 29 U.S.C. § 207(e)(2). Thus, whether the Court should exclude the time Mr. Davis would have worked during an "unlawful termination" will turn on whether "unlawful termination" is "another similar cause" under section 207.

In support of his argument, Plaintiff cites to *Ricco v. Potter,* which held that "hours an employee wanted to work but was *unlawfully prevented* by the employer from working" cannot properly be excluded when calculating the service hours worked by an employee, because they are not an "other similar cause" within the meaning of section 207. 377 F.3d 599, 605 (6th Cir. 2004); *cf. Plumley v. S. Container, Inc.*, 303 F.3d 364, 371–72 (1st Cir. 2002) (finding that an employee must have "actually worked" a minimum of 1250 hours during the 12 months preceding reliance on FMLA). However, *Ricco* can be distinguished from the instant case. "In *Ricco v. Potter,* an employee of the United States Postal Service who was discharged initiated an arbitration to dispute her discharge. The arbitrator ordered that the employee's discharge be converted to a thirty-day work suspension and that she be reinstated and made whole." *Savage v. Chicago Transit Auth.*, 06 C 1407, 2007 WL 809600 (N.D. Ill. Mar. 7, 2007) (citations omitted)

(crediting hours that Plaintiff would have worked after arbitrator found there was no cause for discharge of Plaintiff and that he should be reinstated and awarded full back pay); *Magruda v. Belle Vernon Area Sch. Dist.*, 2009 WL 440386 (W.D. Pa. Feb. 23, 2009) (Same).

Unlike in *Ricco*, there has been no judicial or arbitration proceeding in which Defendant's termination of Mr. Davis in August 2009 was found unlawful. Instead, Mr. Davis, in collaboration with the Union, entered into a "Last Chance Agreement." This agreement reinstated Mr. Davis and treated the time between the August discharge and February 3, 2010 as an unpaid suspension. Williams-Valentine Decl. ¶11, Def's Mot. Summ. J., Ex. 3; LCA, ¶ 1, Def's Mot. Summ J. Ex.8. This agreement does not make any findings as to whether Plaintiff's termination was in fact unlawful, and the agreement is not itself the type of make-whole agreement ordered in *Ricco. Id.* To the contrary, Plaintiff's suspension was unpaid and he received no recompense for the time he did not work.

Moreover, Plaintiff also executed a Release as a part of the "Last Chance Agreement," in which he waived all claims against the Defendant and its agents relating to the circumstances of the 2009 discharge and pre-dating the Release's execution. Release, Def's Mot. Summ. J. Ex. 9. The Court, thus, cannot conclude that Plaintiff's August 2009 termination was unlawful. And Plaintiff's "inability to establish the wrongfulness" of his August 2009 termination is "fatal to his FMLA claim." *Lorenzo v. Donahoe*, 3:11-CV-358-PK, 2012 WL 7071667 (D. Or. Dec. 31, 2012) report and recommendation adopted, 03:11-CV-00358-PK, 2013 WL 531124 (D. Or. Feb. 12, 2013). Aside from Plaintiff's own perceptions regarding the lawfulness of his termination, "no grounds exist for crediting [Plaintiff] for the work-hours he missed during the pendency of his [suspension]." *Id*; *see generally Lorenzo*, 2012 WL 7071667 (holding that a last-chance agreement, which waived all grievances or appeals regarding those absences, precluded Plaintiff

from now establishing that his leave was wrongful as a matter of law). Accordingly, the Court

excludes from the calculation all hours during Plaintiff's suspension from August 24, 2009 to

February 3, 2010.

The Court can now accurately calculate the service hours Plaintiff worked from the

commencement of his leave. The Defendant calculates the total hours worked by an employee by

adding together Regular Pay Hours, Missed Hours of Regular Pay, and Overtime Hours

Worked.[4] Decl. Michael Scruggs ¶ 4, Def.'s Mot. Summ. J. Ex. 11. The Court first addresses the

July 7, 2010 and July 11, 2010 potential commencement dates. According to the Court's

calculations, the Plaintiff worked approximately 848.5 hours between July 1, 2009 and July 10,

2010.[5] And logically, if Plaintiff did not work 1,250 hours by July 10, 2010, then he must not

_____

[4] Plaintiff briefly argues that Defendant does not submit any admissible evidence to
support its claim that Mr. Davis did not meet the 1,250 hour requirement. Pl's Opp'n at19 n. 2.
And of course, only evidence that is admissible at trial should be considered at the summary
judgment stage. *Manuel v. Potter*, 685 F. Supp. 2d 46, 58 (D.D.C. 2010). However, Plaintiff only
objects to Mr. Scruggs's affidavit, arguing that the affidavit is hearsay. Plaintiff has no objection
to copies of the business records submitted by Mr. Scruggs, except that such business records are
not relevant to determining the service hour requirement. Because the Court need only reference
the properly admissible business records, and not Mr. Scruggs's summary of those records, in
determining the number of hours Plaintiff worked for the applicable twelve-month period,
Plaintiff's objection does not help him.

[5] Plaintiff's hours are calculated as follows. July 2009: 6.5 total hours; August 2009:
223.5 total hours; Mar 2010 – June 2010: 563.75 hours. Decl. Michael Scruggs, Def.'s Mot.
Summ. J. Ex. 11; Decl. Michael Scruggs, Def's Reply in Support of Mot. Summ. J. Ex. 3, Aug.
29, 2013, ECF No. 19. July 2010 hours: At the end of July 2010, Plaintiff had a total of 118.75
hours. However, according to Plaintiff's pay stub, as of July 10, 2010, Plaintiff had only worked
54.75 hours, with no missed hours or overtime in the month of July. Decl. Michael Scruggs,
Def's Mot. Summ. J. Ex. 11. The Court thus adds these total hours: 6.5+223.5+563.75+54.75 to
get a total of 848.5 hours worked as of July 10, 2010.

The Court notes that these calculations do not account for any days in February, and in
fact, Mr. Davis's July 10, 2010 paystub indicates that he had worked 682.5 hours up until that
point in 2010. The Court cannot be sure whether this discrepancy can be attributed to the hours
Plaintiff worked in February, as neither party directly points to evidence indicating whether
Plaintiff worked any days in February 2010, or if he did so, the number of hours worked. The
only evidence to indicate that Plaintiff did work in February after being reinstated is found in
Plaintiff's time sheet, documenting the actual hours that Plaintiff worked during his time at

have worked 1,250 hours by July 7, 2010 (as the date is inclusive) or July 11, 2010 (as the date merely adds one day to the calculation, and a day that Mr. Davis was hospitalized and thus did not work). Plaintiff thus cannot meet the threshold service hour requirement in the twelve-month period preceding Plaintiff's commencement of leave, if the Court considers the commencement of leave to have begun either July 7 or July 11, 2010.

Even if the Court assumes that Plaintiff's intermittent leave began August 2, 2010 —the date on which Plaintiff *officially* requested FMLA leave —Plaintiff still cannot meet the 1,250 hour requirement. Between August 1, 2009 and August 1, 2010, Plaintiff worked approximately 906 hours, again significantly shy of the 1,250 service hour requirement.[6] Accordingly, the Court finds that Mr. Davis was not an employee eligible for FMLA leave,[7] and thus Mr. Davis's claim that the Defendant unlawfully denied him FMLA leave must fail.[8]

---

George Washington. Time Sheet, Pl's Opp'n to Def's Mot. Summ. J. Ex. S at 12, Aug. 15, 2013, ECF No. 18. This time sheet indicates that Plaintiff worked for 7.5 hours on 6 days at the end of February. *Id.* There is no indication of any missed days, or of any overtime to add to this calculation (especially considering that Plaintiff did not even work a full eight hours on the days he did work in February). Thus, even if the Court were to credit Plaintiff the additional 45 hours from these six days of work, Plaintiff's total hours would only reach 923.5 hours, still significantly shy of the 1,250 hours required to qualify as an employee eligible for FMLA leave.

[6] Plaintiff's hours are calculated as follows. August 2009: 223.5 total hours; Mar 2010 – June 2010: 563.75 hours. Decl. Michael Scruggs, Def.'s Mot. Summ. J. Ex. 11; Decl. Michael Scruggs, Def's Reply in Support of Mot. Summ. J. Ex. 3, Aug. 29, 2013, ECF No. 19. July 2010 hours: 118.75 hours. Decl. Michael Scruggs, Def's Mot. Summ. J. Ex. 11. The Court thus adds these total hours: 223.5+563.75+118.75 to get a total of 906 hours worked between August 1, 2009 and August 1, 2010. And even if the Court were to add the 75 total hours potentially worked in February, Plaintiff would still have only worked 981 hours, well shy of the 1,250 hour requirement.

[7] Plaintiff notes in his statement of facts section that Defendants documented and conveyed to Mr. Davis that he was eligible for FMLA leave in three instances: August 23, 2010, August 2, 2010, and September 7, 2010. Pl.'s Opp'n. 8; Pl.'s Opp'n, Ex. O–P; Def's Mot. Summ J. Ex. 28. Plaintiff does not explicitly argue that this designation forecloses Defendant's arguments regarding Plaintiff's eligibility for FMLA leave. Nevertheless, the Court finds that these designations will not foreclose the Defendant's arguments.

2. Retaliation

Plaintiff argues that he was retaliated against for exercising and attempting to exercise his

FMLA rights. Defendant moves for summary judgment on Plaintiff's retaliation claim arguing:

(1) Plaintiff is unable to establish a causal link between the exercise of his rights and the adverse

employment action; and (2) Plaintiff is unable to show that Defendant's proffered non-retaliatory

justification for the adverse employment action is mere pretext.

The FMLA's prohibition against interference also "prohibits an employer from . . .

retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights."

*Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d, 146, 152 (D.D.C. 2012) (citing to 29 C.F.R. §

825.220(c)). "The FMLA's retaliation provision is analogous to the sort of 'retaliation' claim that

is familiar under Title VII, in which an employee alleges that the employer discriminated against

the employee for opposing what the employee reasonably believed to be violations

of Title VII by the employer." *Deloatch v. Harris*, 797 F. Supp. 2d 48, 67 n. 14 (D.D.C. 2011)

(citing to *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59 (2006)

("Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an

employee (or job applicant) because he has 'opposed' a practice that Title VII forbids")); *see*

*also* 60 Fed. Reg. 2180, 2218 (Jan. 6, 1995) ("[The FMLA] makes it unlawful for an employer to

discharge or in any other manner discriminate against any individual for opposing any practice

---

Moreover, Plaintiff's August 23, 2010 designation only found Plaintiff eligible for DCFMLA leave – which only has a 1,000 service hour requirement, as opposed to the 1,250 hour requirement for the Federal FMLA. Nor is it clear whether the FMLA leave granted on August 2, 2010 or August 23, 2010 was pursuant to the Federal FMLA or DCFMLA. Because Plaintiff does not fully brief this issue, and because the Court has already found that Plaintiff has not qualified as an eligible employee for Federal FMLA leave as of August 2, 2010, the Court does not find that Defendant's designations of Plaintiff as FMLA eligible forecloses its current argument that Plaintiff failed to meet the statutory requirement.

[8] Because the Court finds that Plaintiff was not eligible for FMLA leave, it need not address Defendant's second argument — that Plaintiff did not properly request FMLA leave.

40

made unlawful by the Act. This opposition clause is derived from Title VII of the Civil Rights Act of 1964 and is intended, according to the legislative history, to be construed in the same manner.").

Thus, "[i]n analyzing an FMLA retaliation claim, courts employ the familiar *McDonnell-Douglas v. Green*, 411 U.S. 792, 93 (1973), burden-shifting framework used in Title VII and ADA cases." *See, e.g., Winder v. Erste,* 511 F.Supp.2d 160, 184 (D.D.C. 2007); *Gaghan,* 2005 WL 3211591, at *5 (citing *Gleklen v. Democratic Cong. Campaign Comm.,* 199 F.3d 1365, 1367 (D.C.Cir. 2000)). Under the *McDonnell Douglas* framework, an employee may establish a *prima facie* case creating a presumption of retaliation by showing "(1) that he exercised rights afforded by the [FMLA], (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the exercise of his rights and the adverse employment action." *Gaghan,* 2005 WL 3211591, at *5.

The parties do not dispute that Plaintiff engaged in a statutorily protected activity (taking FMLA leave) and that he suffered an adverse employment action (his termination). Thus, the Court moves directly to prong three —whether Plaintiff is able to establish a causal connection between his FMLA leave and his termination.

A causal connection can be established by showing that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity." *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)). Although courts have found that a three to four month gap between the protected activity and the adverse employment action is too great to establish an inference of causation, when premised on temporal proximity alone, *see Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam) (citing with approval

circuit cases rejecting temporal proximity of three and four months as evidence of causation); *Gustave–Schmidt v. Chao,* 360 F.Supp.2d 105, 118–19 (D.D.C.2004) (three months is the "outer limit" of temporal requirement under Title VII), the Circuit has not recognized any "bright-line three-month rule." *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012); *see also Jones v. Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009) (holding that even an eleven month gap does not completely foreclose an inference of retaliatory motive). And moreover, Plaintiff here does not rely solely on temporal proximity to evidence retaliation. Plaintiff also claims that Defendant engaged in a pattern of retaliation — every time Plaintiff requested FMLA leave, he was terminated shortly thereafter. Pl.'s Opp'n at 26. For these reasons, the Court finds that Plaintiff has met the causation element of a *prima facie* retaliation claim.

But regardless of whether Plaintiff could raise an inference of causation due to temporal proximity, he must still show that the Defendant's proffered justification is pretext for retaliation. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (holding that once the Defendant has proffered a non-retaliatory justification, a court need only examine whether the Plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason" was in fact pretext for retaliation); *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (explaining that the prima-facie case is largely irrelevant once an employer has asserted a non-discriminatory reason for its adverse employment action); *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008) (applying *Brady* in the retaliation context). Defendant proffers a legitimate, non-retaliatory justification for Plaintiff's termination—that Mr. Davis's absences violated the "Last Chance Agreement" (LCA) executed on February 4, 2010. LCA, Def's Mot. Summ. J. Ex.8.

The LCA states, in relevant part, that "if Mr. Davis is absent from work without the permission of his immediate supervisor on any occasion between February 3, 2010 and February 3, 2011, the University shall be entitled to discharge him immediately." *Id.* at ¶ 3. The LCA further states that "Mr. Davis will be expected to meet normal performance expectations and to comply with the employment standards applicable to other employees in his position." *Id.* at ¶ 4. Thus, pursuant to the LCA, Plaintiff could be terminated if he had even one unexcused absence.

Plaintiff argues that Defendant's justification is plainly pretext as "Mr. Davis complied with GW policies regarding requested leave" and therefore "Mr. Davis never violated the terms of the LCA." Pl.'s Opp'n at 27. Plaintiff's support for this contention, however, is no different than what he alleged in his ADA discrimination claim, which this Court has already found to be insufficient to establish a dispute of material fact. *See supra* Part IV.A.1. As before, Plaintiff makes only one argument in support of a finding of pretext — that on each occasion he was marked AWOL, he either called his supervisor prior to missing work due to his medical condition, or provided medical records after the fact, which his supervisor often refused to accept. *See generally* Davis Decl., Pl's Opp'n Ex.2. Plaintiff does not make any other arguments, or cite to any other facts, adducing a retaliatory mindset.

Plaintiff cannot establish that his unauthorized absence was due to an FMLA qualifying illness, and thus was improperly documented as AWOL. Mr. Davis argues that although his illness was exacerbated by the extreme weather, a hood or a heavy winter coat would have  made him feel better. Dep. Anthony Davis at 50, Def's Mot. Summ. J. Ex. 10. However, Mr. Davis does not dispute that he did actually receive a winter coat. Test. Anthony Davis at 154. As a heavy winter coat was all that Mr. Davis requested or needed in order to overcome the effects of his illness, and because he did in fact receive a heavy winter coat, Mr. Davis cannot establish that

he was absent due to his FMLA qualifying illness, and was thus improperly documented as AWOL on December 8th and 9th.

In sum, Mr. Davis argues that the Defendant's proffered non-retaliatory justification for his termination is pretext for one reason only: that Mr. Davis always complied with the Defendant's leave policy and thus never violated the terms of the LCA. However, the LCA allows the Defendant to terminate Mr. Davis if he is AWOL on even one occasion, and Mr. Davis is unable to raise a dispute of material fact that he was improperly documented as AWOL on December 8 and 9, 2010. As a result, Mr. Davis is unable to establish that the Defendant's proffered justification for termination is mere pretext for retaliation, and so his FMLA retaliation claim fails as well.

### C. DC Family Medical Leave Act

Plaintiff next argues that Defendant violated the D.C. Family Medical Leave Act ("DCFLMA"), D.C. Code § 32–503, by intentionally denying Mr. Davis's leave requests, and terminating his employment because he requested leave. Pl's Compl. ¶ 23. The DCFMLA, like the Federal FMLA, allows an employee "who becomes unable to perform the functions of the employee's position because of a serious health condition" to take "medical leave for as long as the employee is unable to perform the functions, except that the medical leave shall not exceed 16 workweeks during any 24–month period." D.C. Code § 32–503.

Defendant argues that Plaintiff's claims under the DCFMLA are barred by the statute's one-year limitations period. The District of Columbia Code provides that "[n]o civil action may be commenced more than 1 year after the occurrence or discovery of the alleged violation [of the DCFMLA]." D.C. Code § 32-510(b)(2001). Plaintiff was terminated on December 13, 2010 and filed this lawsuit in D.C. Superior Court on July 30, 2012, approximately 19 months after his

termination. *See* Notice of Removal Ex. 1 at 1, Aug. 29, 2012, ECF No. 1. Under a plain reading of the statute, Plaintiff's DCFMLA claims are time-barred.

Plaintiff argues, however, that the DCFMLA statute of limitations should have been tolled while he exhausted his administrative remedies by pursuing an EEOC complaint. Pl's Opp'n at 27. Plaintiff reasons that the District of Columbia Court of Appeals has tolled the statute of limitations in an analogous D.C. statute, the D.C. Human Rights Act ("DCHRA"), while the Plaintiff exhausted any administrative remedies. *See Jaiyeola v. Dist. of Columbia*, 40 A.3d 356, 369 (D.C. 2012). He additionally argues that the purposes of the DCHRA and the DCFMLA are similar, as each "serve to protect employees from unfair employment practices and the purposes of these statutes are furthered by the tolling of the statute of limitations while an employee files a claim before the EEOC." Pl's Opp'n at 28. Thus, Plaintiff argues that the Court should apply DCHRA tolling rules to the DCFMLA.

However, as Plaintiff's argument itself recognizes, the tolling of the statute of limitations only furthers the purpose of the statute if the employee is required to first file a claim under that statute before the EEOC, or an analogous administrative body. That is to say, a court tolls the statute of limitations precisely because Plaintiff is *required by law* to first exhaust any available administrative remedies before filing a suit in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006) (explaining that "[t]he doctrine [of exhaustion of administrative remedies] provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.") (citations omitted).

Unlike the DCHRA, which requires the Plaintiff to first exhaust administrative remedies, the DCFMLA has no exhaustion requirement. *Simmons v. Dist. of Columbia*, 977 F. Supp. 62, 64-65 (D.D.C. 1997) ("the court concludes that the [DC]FMLA does not require exhaustion of

administrative remedies prior to filing a civil action in court. Rather, the [DC]FMLA provides two alternative routes for an aggrieved party to seek redress for the alleged wrongdoing."). Courts in this district have thus held that the DCFMLA's statute of limitations is not tolled during the time period that Plaintiff pursues his administrative remedies for his other claims. *Jackson v. Wilkes Artes*, 565 F. Supp. 2d 148, 152 n.4 (D.D.C. 2008) ( "the fact that plaintiff was exhausting her administrative remedies with respect to her other claims did not toll the statute of limitations for her DCFMLA claim."); *Lightfoot v. District of Columbia*, 2006 WL 54430, at *7 n. 6 (D.D.C. Jan.10, 2006) (the fact that the plaintiff was engaged in other internal and external grievance processes is not a basis for not filing this [DCFMLA] action within one year after his termination."); *See also*, *Redman v. N.Y. State Dep't of Corr. Servs.*, 2011 WL 5119574, at *3 (S.D.N.Y. Oct. 12, 2011) ("The fact that plaintiff filed a grievance with the EEOC does not toll the statute of limitations applicable to her [federal] FMLA claim because the EEOC has no enforcement authority with respect to the FMLA and the statute contains no exhaustion provision."); *Fulghen v. Potter*, 2010 WL 4865818, at *3 (E.D. Mich. Nov. 16, 2010) (holding that "the filing of a discrimination charge with the EEOC does not toll the [federal] FMLA statute of limitations" and citing additional authority).

The Court thus holds that the DCFMLA's one-year statute of limitations began to run from the date of Plaintiff's termination on December 13, 2010. Accordingly, because the Plaintiff filed this complaint approximately 19 months after his termination, well outside of the one-year statute of limitations period, the Court finds that Plaintiff's DCFMLA claims are time-barred.

### D. Tortious Interference of Contract

Plaintiff finally argues that Aramark, though its agent John Eshun, tortiously interfered with Plaintiff's employment contract with the University by falsely accusing Mr. Davis of being AWOL, refusing to accept Mr. Davis's medical documents, and by manufacturing other false information against Mr. Davis. Compl. ¶ 33. Aramark argues that Mr. Davis's tortious interference claim fails as a matter of law because (1) Aramark acted as an agent of GW, (2) Mr. Davis's Interference claim is preempted by Section 301 of the Labor Management Relations Act ("LMRA"), and (3) Aramark was privileged to act as it did. Because the Court agrees that Plaintiff's claim is preempted by the LMRA, it need not address the other two arguments.

Section 301(a) of the LMRA provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a) (2014). Section 301 was included in the LMRA in order to "promote collective bargaining agreements" that neither the union nor the employer could easily break, in order to "stabilize industrial relations." *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 454 (1957). Moreover, the Supreme Court recognized that the LMRA "does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way." *Id.* at 455. The Court has thus held that section 301 "not only provides federal-court jurisdiction over controversies involving collective-bargaining agreements, but also 'authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.'" *Lingle v. Norge Div. of*

*Magic Chef, Inc.*, 486 U.S. 399, 403 (1988) (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957)).

Although Plaintiff's tortious interference claim is one that is based on state law, section 301 can still preempt the claim. "[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute." *Lingle*, 486 U.S. at 405-06 (emphasis added). Thus, the Court must determine whether the resolution of Plaintiff's tortious interference claim turns on the interpretation of the CBA.

"To establish a *prima facie* case of intentional interference with contractual relations, the plaintiff must show: '(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach.'" *Sokos v. Hilton Hotels Corp.*, 283 F. Supp. 2d 42, 49 (D.D.C. 2003) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 807 (D.C. 2003)) (emphasis added). The third element of the claim plainly requires that the Court determine whether or not there has been a breach of contract. Mr. Davis alleges that Aramark's misrepresentations led George Washington to breach the CBA. Determining whether this is so will require the court to interpret the CBA. Thus, Mr. Davis's claim is preempted.

A case from this district is illustrative. In *Sokos v. Hilton Hotels Corp.*, a terminated hotel employee brought suit against his employer and one of his supervisors. 283 F. Supp. 2d 42, 44 (D.D.C. 2003). One of the claims in the suit was a tortious interference with contractual relations claim against his supervisor. *See id*. at 49. The plaintiff in *Sokos* alleged that the supervisor "misrepresented that [the plaintiff] had stolen or taken Hotel property without authorization" and that his "employment was terminated as a result of [the supervisor's]

intentional misconduct." *Id.* The Court held that the claim was preempted by § 301 because it "would have to interpret the terms of the collective bargaining agreement" in order to determine whether the supervisor induced a breach. *Id.* at 50. *Accord Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 235 (3d Cir. 1999) (holding that the LMRA preempted plaintiff's tortious interference claim because it was "inextricably intertwined" with the interpretation of a collective-bargaining agreement). In *Sokos,* the Court found that the CBA was "the only source from which the plaintiff derived any express or implied contractual right" and that thus, the Court "would have to interpret the terms of the collective bargaining agreement in order to determine whether defendant [ ] 'interfered with the performance of the contract.'" *Sokos*, F. Supp. 2d at 50.

Neither party contests that Mr. Davis's employment was governed by the CBA, nor do they provide evidence of other contractual agreements from which Plaintiff could derive a contractual right. In fact, as Mr. Davis himself alleges, he believed that "only the rules in the Collective Bargaining Agreement" applied to him. Davis Decl. ¶ 33. Thus, as in *Sokos*, the Court will have to interpret the terms of the sole contractual agreement, the CBA, to determine whether Defendant Aramark's alleged misrepresention of Plaintiff's conduct led to the breach of contract. *See* Compl. ¶ 33; Pl.'s Resp. at 16, 27.

Mr. Davis also argues that "it is not always necessary . . . to prove that a contract was breached to prevail on a claim of [tortious] interference," because at-will employees can bring tortious interference claims with respect to the loss of a prospective economic advantage. Pl.'s Resp. at 31. This is both true and irrelevant; Mr. Davis has stipulated that he was not an at-will employee, and the claim in this case is a tortious interference with contractual relations claim. *See* Compl. ¶¶ 33-36. Mr. Davis attempts to merge these two doctrines, stating that "[i]f a defendant causes a third party to terminate an employee, the defendant's interference is tortious

even if the third party breached no contract."  Pl.'s Resp. at 32.  Mr. Davis cites to no authority

for this novel claim.  Mr. Davis does cite to *Lingle*, where the Supreme Court held that an

unlawful discharge claim could be resolved without interpreting the terms of a collective

bargaining agreement.  486 U.S. at 407.  However, the elements of the state-law wrongful

discharge claim in that case were (1) whether the employee "was discharged or threatened with

discharge" and (2) whether the employer's motivation was proper.  *Id*. (citing *Horton v. Miller

Chem. Co.*, 776 F.2d 1351, 1356 (7th Cir. 1985).  Thus, although the cause of action in *Lingle*

did not require the court to determine whether there was a breach of contract, that is not the case

for a claim for tortious interference of contract, as argued here.

Because Plaintiff is not an at-will employee, and because resolution of the tortious

interference of contract claim will require interpretation of the CBA, Plaintiff's claim is

preempted by Section 301 of the LMRA.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are granted on

all counts except for the hostile work environment claim under the ADA, which is denied

**without prejudice.** An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  March 20, 2014                                    RUDOLPH CONTRERAS
                                                                        United States District Judge